Taft, J.
The first question to be considered is whether the evidence was such that reasonable minds could come to the conclusion that defendants, in supplying these bleachers, were negligent in either of the two respects specified in the third amended petition, upon which the case was tried.
As to the second specification of negligence, there is no evidence in the record that “defendants were notified that [in] their type of bleachers and that in their method of constructing and installing the same, the said top seat plank would slip out and off of the bracket.” (Emphasis added.)
This leaves the charge that defendants were negligent only in that “the board or timber upon which plaintiff and others were seated had not been securely fastened to the tread of the supporting timber upon which it rested.”
It is manifest that there was a hazard to one seated in the top row of the bleachers which was not found in any other row of seats. If a seat board in any other row was removed, the spectator seated in such row would probably not receive a serious fall, because he would be protected by the seats behind him. On the other hand, if the seat board on the top row slipped back, there was nothing to protect a spectator in that row from falling backward to the ground, which was a distance of approximately nine to ten feet below that seat board.
The only thing to prevent the seat board in the *479 top row from being pushed back would be the rear one inch upright portion of the U brackets upon which that board rested. Pictorial exhibits of these bleachers disclose that no seat board was supported by more than four of these brackets. Furthermore, the seat board upon which plaintiff had been sitting overlapped the next seat board. It is. apparent, therefore, that the rear one-inch upright portion of the U bracket, at the point at which plaintiff’s seat board overlapped the adjoining seat board, could have no effect in preventing his seat board from being pushed back. This conclusion necessarily follows from the evidence that the seat boards were from one to one and one-half inches thick whereas these upright portions of the brackets were only one inch high. Also, it would not be unlikely for this overlapping of a seat board to prevent that seat board from being held securely by the rear one inch upright portion of the next U bracket, which was only four feet away. The only thing, to prevent further upward movement of the seat board upon which plaintiff had been sitting above the rear one-inch upright portion of any of the U brackets, was the weight of that board or the weight of those seated upon it. It is apparent also that the excited movements of spectators jumping up to see a play might well cause such further upward movement of this seat board above the rear one-inch upright portions of the U brackets.
In our opinion, reasonable minds could come to the conclusions that (1), under the foregoing circumstances, the failure to securely fasten a top row overlapping seat board would result in a serious hazard during a crowded night football game to those who would be located where the plaintiff was located prior to his fall, and (2) defendants’ experience and familiarity with this type of bleachers were such that they should have recognized that hazard.
*480 Admittedly, defendants knew that these temporary stands would be used at such a crowded night game within a few hours after their erection and that there would probably be no time for the school authorities to take any steps after their erection to guard against such a hazard.
There was much evidence in the record showing that the same type of bleachers was used by all high schools and colleges in the area which used temporary bleachers and about whose bleacher equipment there was evidence. Likewise, there was much evidence that this type of bleachers had not only been rented for use at high school football games but also had been used extensively at wrestling and boxing matches; and none of the witnesses who testified concerning their experience with this type of bleachers knew of any accident resulting from a seat board slipping out of its brackets.
Defendants rely upon Englehardt, a Minor, v. Philipps, 136 Ohio St., 73, 23 N. E. (2d), 829. We believe that paragraph four of the syllabus in that case points up the distinction between that case and the instant case. That paragraph reads:
“Because of the impracticability of avoiding the presence of moisture on commercial areas and surfaces as commonly used and maintained, and upon which persons are invited to go, while such areas or surfaces are in a slippery condition because of the presence of rain or other forms of moisture, the law generally declines to fix liability against those creating or maintaining such surfaces or areas in favor of those who slip and fall thereon.”
It does not take one of a mechanical mind to devise any one of several simple and relatively inexpensive means which might have been adopted by defendants to securely fasten the top seat board on *481 this type of bleachers, or to otherwise guard against the hazard hereinbefore referred to.
As to the argument that these defendants, by supplying the same type of bleachers owned and used for seating at football games throughout central Ohio and elsewhere throughout the United States by high schools and colleges, especially in the absence of knowledge of any accident resulting from a seat board slipping out of its brackets, could not, to use the words in paragraph two of the syllabus of the Engleharclt case, be charged with conduct falling “below the standard represented by the conduct of reasonable men under the. same or similar circumstances,” we believe that the answer to such argument is suggested in the recent opinion in Morris v. Cleveland Hockey Club, Inc., ante, 225, 231, where Stewart, J., said:
“The effect of evidence as to customary methods of protection was considered by this court in the case of Ault v. Hall, 119 Ohio St., 422, 164 N. E., 518, 60 A. L. R., 128. Paragraphs three and four of the syllabus in that ease read as follows:
“ ‘3. Customary methods or conduct do not furnish a test which is conclusive or controlling on the question of negligence or fix a standard by which negligence is to be gauged, but conformity thereto is a circumstance to be weighed and considered with other circumstances in determining whether or not ordinary care has been exercised.
“ ‘4. Methods employed in any trade, business or profession, however long continued, cannot avail to establish as safe in law that which is dangerous in fact.’ ”
Perhaps in paragraph three of that syllabus it would have been better to insert the word “always” after the words “customary anethods or conduct do not.” *482 Otherwise, the language of that paragraph might appear to be inconsistent with that of paragraph two of the syllabus in the Englehardt case, reading:
“Legal liability for negligence is based upon conduct involving unreasonable risk to another, which must be established by affirmative evidence tending to show that such conduct falls below the standard represented by the conduct of reasonable men under the same or similar circumstances.”
However, in each of those cases the syllabus must be read in the light of the facts of the case.
The real question in each case was whether reasonable minds could come to the conclusion that the defendant’s conduct fell below the standard of ordinary care. Customary conduct or methods were circumstances to be considered with other circumstances in determining whether they could. Among the other circumstances to be so considered in each case was the serious danger involved as a consequence of the defendant’s conduct. See Soltz v. Colony Recreation Center, 151 Ohio St., 503, 510, 87 N. E. (2d), 167; 38 American Jurisprudence, 677, Section 31. Such danger is involved in the instant case, where a spectator seated on the rear seat board of these bleachers would be between nine and ten feet above the ground and not, therefore, in a position to avoid serious injury if the protection of that board were removed, as he might have been if located closer to the ground. Cf. Boles v. Montgomery Ward & Co., 153 Ohio St., 381, 92 N. E. (2d), 9; J. C. Penny Co., Inc., v. Robison, 128 Ohio St., 626, 193 N. E., 401; Smith v. Marks Isaacs Co. (La. App.), 147 So., 118; Paley v. Palmer et al., Trustees, 129 Conn., 392, 28 A. (2d), 844. Among the other circumstances considered in the Ault and Englehardt cases and to be considered in the instant case was the practicability of avoiding the hazard in volved. *483 Although, as indicated by paragraph four of the syllabus in the Englehardt case, the impracticability of avoiding the hazard there involved was such as to justify the conclusion that the conduct of the defendant there did not fall below the standard of ordinary care, we do not believe, as hereinbefore pointed out, that there are any such circumstances of impracticability in the instant case which would justify such a conclusion as a matter of law.
The next question to be considered is whether, because plaintiff was an invitee of the occupier of the premises, any cause of action of plaintiff would be against such occupier of the premises and not against someone such as defendants who, before plaintiff’s injury, merely constructed the bleachers on such premises, rented them and turned over their possession and control to the occupier of those premises.
In support of their position on this question defendants rely upon the decision of this court in Burdick v. Cheadle, 26 Ohio St., 393, 20 Am. Rep., 767.
However, in Stackhouse v. Close, 83 Ohio St., 339, 94 N. E., 746, this court held that, “where a lessor reserves * * * the right to direct and supervise any alterations made by the tenant, and alterations are made with knowledge of lessor,” such lessor may be held liable to an invitee of the tenant.
In the opinion by Johnson, J., in that case it is stated at page 353:
“The effect of the grant of permission to make the changes under the direction and supervision of the architect of Close was to leave him in partial control of the premises. No change could be made by the lessee except under such direction and supervision so that it presents an entirely different case from one where a landlord has demised the entire premises with full control to his tenant for the term of the lease.
*484 “In this case whatever obligation or liability for injury to persons rightfully on the premises is imposed by law on the tenant, rests equally on the landlord, so far as it results from any change made under the conditional grant of permission by Close.”
The evidence in the instant case would justify a finding by the jury that defendants did not merely reserve the right to direct and supervise the alterations in the premises of the school, involved in the erection of the bleachers, but actually erected those bleachers.
Furthermore, in constructing the bleachers on the school premises and renting them to. the school for use by the school in seating spectators at the football game, the defendants were in a position analogous to one who sells or furnishes an article of property to another, where it is contemplated by the parties that a third party will ultimately use that article and may be injured by any hazard involved in such use. Such one, who sells or furnishes such article, may be held liable for negligence in doing so, even in the absence of privity between the one injured and the one so selling or furnishing such article. Pennsylvania Bd. Co. v. Snyder, 55 Ohio St., 342, 45 N. E., 559, 60 Am. St. Rep., 700; Sicard v. Kremer, 133 Ohio St., 291, 13 N. E. (2d), 250. See 46 American Jurisprudence, “Sales,” new paragraphs at end of Section 812, as set forth in cumulative supplement.
Another significant distinction between the instant case and Burdick v. Cheadle, supra, is brought out by that part of the syllabus of the latter case reading: “The fixtures put up under the agreement were unsafe and insecure from the want of sufficient fastening to the walls of the building — all of which was known to the defendant, who, on request of the lessee, refused and neglected to repair.” Furthermore, it appears from the report of the decision that such lessee knew *485 of the unsafe and insecure condition of the fixtures and made that request 22 days before the injuries to the plaintiff in that case.
In the instant ease, the evidence does not require a finding as a matter of law that the school authorities knew of the hazard involved, as did the lessee in Burdick v. Cheadle, supra. Likewise, the evidence would justify a finding that the school, in the few hours between the erection of the bleachers by defendants and the game, did not have an opportunity to learn of or guard against that hazard in any way comparable to the opportunity which defendants had had from their years of familiarity with this type of bleachers. We do not therefore have a situation where, after actual knowledge of that hazard, the occupier of the premises invites some one onto those premises and thereby knowingly exposes his invitee to such a hazard. In such a situation, it is apparent that a proximate cause of any injury to such invitee resulting from such hazard is the negligence of the occupier of the premises. It is arguable that, where the occupier of the premises has such full knowledge of the potential danger, his invitation to some one to come onto his premises, thereby voluntarily and knowingly exposing such invitee to such danger, may as a matter of law break the chain of proximate causation which might otherwise exist between the negligence of the one who originally created the danger and the injuries to such invitee. See annotation, 164 A. L. R., 371.
That was the situation with which this court was confronted in Burdick v. Cheadle, supra. Such situation in that case had therefore become a situation somewhat comparable to that which existed in Cooper v. Roose, 151 Ohio St., 316, 85 N. E. (2d), 545, where the claim of negligence of the lessor was, in effect, *486 based upon the mere failure to remove a hazard rather than upon negligence in creating that hazard.
Defendant Haft contends that, even if the evidence was sufficient to justify submission of this cause to the jury against defendant Turner, it was not sufficient to justify such submission as against Haft.
Admittedly, the bleachers were owned by Haft. There was evidence of an understanding between Haft and Turner under which Haft fixed the price to be charged for their use, Turner was to have supervision of their erection and removal and of employment of those necessary to erect and remove them, Turner was to pay all expenses in connection with their erection and removal, and the net proceeds from the rental, after payment of expenses, were to be divided equally between Haft and Turner.
Without considering -whether there was any other theory upon which Haft could be held liable, we are of the opinion that the evidence was such that reasonable minds could come to the conclusion that, in furnishing these bleachers to and erecting them for the school, defendants Haft and Turner were acting as partners or engaged in a joint enterprise. Harvey v. Childs, 28 Ohio St., 319, 22 Am. Rep., 387, Goubeaux, Recr., v. Krickenberger, Exrx., 126 Ohio St., 302, 185 N. E., 201.

Judgment affirmed.

Weygandt, C. J., Zimmerman, Stewart, Middleton and Matthias, JJ., concur.